**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

| | | |
|---|---|---|
| Westmoreland Beulah Mining LLC,<br><br>Plaintiff-Counter Defendant,<br><br>v.<br><br>International Union United Mine Workers of America,<br><br>Defendant-Counter Claimant. | ) | **ORDER**<br><br>Case No.: 1:26-cv-00120 |

Presently before the court is a *Motion for Preliminary Injunction* filed by Defendant International Union United Mine Workers of America ("Defendant") (Doc. No. 21), and cross *Motions for Summary Judgment* filed by Defendant and Plaintiff Westmoreland Beulah Mining LLC ("Plaintiff"). (Doc. Nos. 35, 36). For the reasons that follow, Defendant's *Motion for Summary Judgment* (Doc. No. 35) is granted, the *Motion for Preliminary Injunction* (Doc. No. 21) is deemed moot, and Plaintiff's *Motion for Summary Judgment* (Doc. No. 36) is denied.

## I. BACKGROUND

The following facts are taken from Plaintiff Westmoreland Beulah Mining LLC's ("Plaintiff") Complaint and are assumed true for purposes of this Order.

On April 21, 2026, Plaintiff filed a Complaint in this court against Defendant. (Doc. No. 1). Therein, Plaintiff alleged a claim pursuant to the Labor Management Relations Act ("LMRA"). (*Id.*).

The parties entered into a collective bargaining agreement ("CBA") effective March 1, 2022, through February 28, 2027. (*Id.* at 2). The CBA governs the employment terms and conditions of Defendant's members employed by Plaintiff at its mine in Beulah, North Dakota. (*Id.*). The CBA contains successorship language: "The Company promises that its operations covered by this Agreement shall not be sold, conveyed or otherwise transferred or assigned to any

successor without first securing the written agreement of the successor to assume the Company's obligations under this Agreement." (Doc. No. 1-1 at 4).

Plaintiff operates the mine pursuant to two Permits to Engage in Surface Coal Mining and Reclamation Operations, which cover approximately 9,000 acres. (Doc. No. 1 at 2). Coal mining operations at the mine ceased in 2022. (*Id.*). Since that time, the mine has been undergoing final reclamation, with substantial completion anticipated by 2029. (*Id.*).

Plaintiff regularly and routinely purchased, swapped, and sold various parcels of land associated with the mine. (*Id.* at 3). On May 28, 2025, Plaintiff entered into an Option Agreement with Talon Nickel (USA) LLC ("Talon"), which granted Talon a "three-month examination period to conduct diligence with an option to eventually purchase a roughly 260-acre parcel of land at the Beulah Mine known as 'the Yard' and an adjacent rail spur." (*Id.*).

Talon intends to use the Yard as a mineral processing facility, consistent with the approved post-mining land use designation of "Industrial/Commercial" for the parcel. (*Id.*). The reclamation obligations remain unchanged, the Option Agreement contains no rights to mine coal, the Yard does not contain coal-producing or coal-preparation facilities, and the CBA does not contemplate job descriptions or work performed in a mineral processing facility. (*Id.*).

In the event Talon exercised its option to the Yard, it can exercise its right to enter into an Ore Delivery Payment Agreement. (*Id,*). Whether or not Talon pursues plans for a mining processing facility at the Yard, Plaintiff's reclamation obligations will continue. (*Id.*).

On June 3, 2025, Defendant filed a grievance alleging Plaintiff's execution of the Option Agreement violated multiple provisions of the CBA, including the successorship clause. (*Id.*). Plaintiff denied the grievance in a Step 3 written response, to which Defendant invoked arbitration under the CBA. (*Id.* at 4).

On August 27, 2025, Talon exercised its rights under the Option Agreement, which provided for a three-year window in which it could purchase the Yard and rail spur. (*Id.*).

On September 11, 2025, Arbitrator Joseph Cannavo ("Arbitrator Cannavo") conducted a hearing, and on January 24, 2026, issued an award finding Plaintiff was not in compliance with the CBA's successorship provisions. (*Id.*).

In its Complaint, Plaintiff now argues that the Arbitrator exceeded his authority under the LMRA by issuing an award that did not draw its essence from the CBA, disregarding clear language of the CBA, improperly adding new terms to the CBA, and exceeding his authority under Article 5.25 of the CBA. (*Id.* at 4-5).

On July 31, 2026, Defendant filed a *Motion for Preliminary Injunction*, in which Defendant requested the court enjoin Plaintiff from engaging in "any sale, conveyance, transfer, or assignation of the 260-acre parcel of land at the Beulah Mine known as 'the Yard,' or any other parcel of land at the Beulah Mine, to Talon Nickel (USA) LLC ('Talon') or any other third party pending disposition of this case." (Doc. No. 21 at 1).

On September 18, 2026, the parties filed cross *Motions for Summary Judgment*. (Doc. Nos. 35, 36). Each party filed its response on October 2, 2026. (Doc. Nos. 37, 38). Per the parties' Scheduling Order (Doc. No. 19), no replies are to be submitted. Accordingly, the motions are ripe for this court's consideration.

## II. LEGAL STANDARD

Federal Rules of Civil Procedure 56 governs summary judgment. "A party may move for summary judgment, identifying each claim or defense – or part of each claim or defense – on which summary judgment is sought." Fed. R. Civ. P. 56(a). Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* In terms of whether facts are material, "[o]nly disputes over facts

that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine," if the evidence is enough that a reasonable jury could return a verdict in favor of the nonmoving party. *Id.*

In situations involving cross motions for summary judgment, the standard summary judgment principles apply, with slight modification. *Durand v. Fairview Health Servs.*, 230 F.Supp.3d 959, 965 (D. Minn. 2017), *aff'd*, 902 F.3d 836 (8th Cir. 2018) ("When considering the [Plaintiffs'] Motion, the Court views the record in the light most favorable to [Defendant], and, when considering [Defendant's] Motion, the Court views the record in the light most favorable to the [Plaintiffs].").

## III. DISCUSSION

Defendant requests the court enter summary judgment in its favor as there is no genuine issue as to any material fact and it is entitled to judgment as a matter of law with respect to Plaintiff's claim to vacate the January 24, 2026, arbitration award, and to Defendant's counterclaim to confirm and enforce the award. (Doc. No. 35). Plaintiff requests this court grant summary judgment in its favor, vacate the January 24, 2026, arbitration award, and deny the counterclaim to confirm and enforce the award. (Doc. No. 36).

Parties may seek to confirm or vacate arbitration awards pursuant to Section 301 of the LMRA. 29 U.S.C. § 185. When reviewing an arbitration award, the court's role is limited to ensure the federal policy of settling labor disputes by arbitration is not undermined if the court had a final say on the merits. *Exide Techs. v. Int'l Bhd. of Elec. Workers, Loc. No. 700*, 964 F.3d 782, 786 (8th Cir. 2020). With that limited role, an arbitration award may stand if the arbitrator arguably construed or applied the contract and acted within his scope of authority. *United Food & Com.*

*Workers Union, Loc. No. 663 v. Seneca Foods Corp.*, No. 25-CV-2891 (KMM/EMB), 2026 WL 995195, at *4 (D. Minn. Apr. 14, 2026). The award will not be set aside if the arbitrator made "serious error" when interpreting the contract. *Id.* However, pursuant to the Federal Arbitration Act ("FAA"), an arbitration award may be vacated in the following circumstances:

> (1) where the award was procured by corruption, fraud, or undue means;
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any misbehavior by which the rights of any party have been prejudiced; or
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter was not made.

9 U.S.C. § 10(a)(1)-(4).

In addition to these statutory grounds, the Eighth Circuit has identified two "extremely narrow" circumstances where the court can vacate an arbitration award, i.e.., (1) where the award fails to draw its essence from the agreement, and (2) where the arbitrator's decision manifests disregard for the law. *Meridian Med. Techs., Inc. v. Int'l Bhd. of Teamsters, Chauffers, Warehousemen & Helpers of Am., Loc. Union No. 688*, 158 F.4th 924, 929 (8th Cir. 2025); *see Hoffman v. Cargill Inc.*, 236 F.3d 458, 461-62 (8th Cir. 2001). "An arbitrator's award draws its essence from the parties' agreement as long as it is derived from the agreement, viewed in the light of its language, its context, and any other indicia of the parties' intention." *Meridian Med. Techs., Inc.*, 158 F.4th at 929 (quoting *Williams v. Nat'l Football League*, 582 F.3d 863, 883 (8th Cir. 2009) (cleaned up)). An arbitration award may evidence a manifest disregard for the law when the arbitrator is shown to be fully aware of the governing legal principle but does not apply it. *Horton, Inc. v. NSK Corp.*, 544 F.Supp.2d 817, 824 (D. Minn. 2008); *see Stark v. Sanberg, Phoenix & von Gontard, P.C.*, 381 F.3d 793, 802 (8th Cir. 2004). Manifest disregard is not shown by an

arbitrator's failure to elaborate on the reasoning supporting an award, by failing to clearly identify the applicable law or to explain how the law applies. *Horton, Inc.*, 544 F.Supp.2d at 824.

Both parties agree that the material facts in this matter are not in dispute. (Doc. Nos. 35-1 at 6; 36-1 at 7). As such, the only remaining issue is whether the arbitration award draws its essence from the CBA.[1] In determining whether the arbitrator's award draws its essence from the parties' agreement, the court may vacate an award ignoring the plain language of the agreement, however, arbitrators are free to interpret ambiguous language. *Meridian Med. Techs., Inc.*, 158 F.4th at 929. An arbitrator's interpretation of silent or ambiguous language must consider the parties' intent. *Id.*

Arbitrator Cannavo issued the award on January 24, 2026, sustaining Defendant's grievance and finding Plaintiff's transaction with Talon violated the parties' CBA. The award provided that Plaintiff had the option of rescinding the option agreement or secure a written agreement from Talon to assume Plaintiff's obligations under the CBA. In his discussion and opinion, Arbitrator Cannavo acknowledged that in alleged non-disciplinary violations of CBAs, it is the union that bears the burden of establishing the employer violated the contract. (Doc. No. 25-21 at 38). To do so, the union must identify the contract provision alleged to have been violated and establish the facts it relied on to allege the contract violation. (*Id.*) The employer may rely on the same criteria to rebut the union's prima facie case. (*Id.*). When attempting to establish a contract violation,

> [w]here the contract language in dispute is clear and unambiguous, the union can rely on the plain and simple meaning of that contract language to establish its intent. If the contract language in dispute is not clear and ambiguous, the union can establish the intent of the contract language by relying on bargaining history, grievance settlements, past practices, arbitral authority, judicial authority or customs and practices in the industry.

---

[1] Both parties focus their analysis on whether the arbitration award draws its essence from the CBA. The court shall consider the same.

(*Id.*). Arbitrator Cannavo took arbitral notice that disputes arising out of successorship clauses in CBAs are more prevalent in the coal mining industry, arbitration and judicial decisions regarding successorship in the coal mining industry are voluminous, and central to these disputes are union concerns of bad faith or artifices to circumvent successorship obligations. (*Id.*).

Central to the instant dispute is Appendix F of the CBA, which provides the successorship clause agreed on by the parties.

> **THIS AGREEMENT**, entered into by and between **WESTMORELAND BEULAH MINING LLC**, and its successors and assigns, hereinafter referred to as the Company, and the **UNITED MINE WORKERS OF AMERICA**, hereinafter referred to as the Union. Further this Agreement shall be binding upon the parties and their respective successors and assigns. The Company promises that its operations covered by this Agreement shall not be sold, conveyed or otherwise transferred or assigned to any successor without first securing the written agreement of the successor to assume the Company's obligations under this Agreement. Immediately upon the conclusion of such sale, conveyance, assignment and transfer of its operation the Company shall notify the Union of the transaction. Such notification shall be by certified mail to the Secretary-Treasurer of the International Union and shall be accompanied by the documentation that the successor obligations have been satisfied, The Employer shall not be a guarantor or be held liable for any breach by the purchaser, executor, administrator, or trustee of its obligations, and the Union will look exclusively to the purchaser, executor, administrator, or trustee for compliance with the terms of this Agreement.

(Doc. No. 25-8 at 3) (emphasis in original). Upon review of this clause, Arbitrator Cannavo determined that it provided in plain and simple language that:

> - this Agreement shall be binding upon the parties and their respective successors and assigns;
> - the Company promises that its operations covered by this Agreement shall not be sold, conveyed or otherwise transferred or assigned to any successor without **first** securing the written agreement of the successor to assume the Company's obligations under this Agreement.

(Doc. No. 25-21 at 39) (emphasis in original).

Finally, Arbitrator Cannavo pointed out that he was not ruling on the unfair labor practice charge, nor was he substituting his judgment for that of the National Labor Relations Board ("NLRB"). (*Id.* at 40, 45 ("The Arbitrator understands that he is not being asked to determine

whether or not the Company violated the National Labor Relations Act.")). Instead, Arbitrator Cannavo considered two questions: (1) "Did the Company violate the successorship clause of the collective bargaining agreement by not securing a promise by the potential buyer to assume the Company's obligations pursuant to the collective bargaining agreement?" and (2) "By its responses to the Union's information request, can it be determined that the Company was not acting in good faith regarding the potential sale and successorship?" (*Id.* at 41-42).

Plaintiff argues the award should be vacated as the arbitrator failed to consider the parties' intent. "The Award fails to consider the industrial common law; places improper weight on inapposite and improper parol evidence; is contrary to common experience and logic; and demonstrates a reliance on an imported standard through which the Arbitrator dispensed his own brand of industrial justice." (Doc. No. 36-1 at 10). However, the plain and simple meaning of the contract language is considered when the agreement is unambiguous, as is the situation here.

As to the first question, Arbitrator Cannavo reiterated his finding that the CBA contained a clear and unambiguous provision regarding successorship, which provided that Plaintiff was not to sell, lease, or otherwise transfer or assign to any successor without first securing the successor's written agreement to assume Plaintiff's obligations under the CBA. (Doc. No. 25-21 at 43). As the agreement was unambiguous, Defendant was free to rely on the plain and simple language of the contract to establish intent. Defendant established the intent of the successorship clause by relying on bargaining history, practices and customs of the industry, and with the Plaintiff's participation in the successorship. (*Id.*). The arbitrator further noted that the intent of the successorship clause had been established by judicial and arbitral authority. (*Id.*).

> The successorship clause and its background and history in no way whatsoever suggest that it is permissible to enter into a sale or lease or transfer agreement and then later have the successor agree to assume the terms and conditions of the collective bargaining agreement. To do so would … be nonsensical.

(*Id.*).

Plaintiff's assertion that the award failed to consider industrial common law likewise fails. Plaintiff focuses on the term "operations," which it argues is a term of art with a commonly understood meaning in the coal industry, and failure to properly interpret the term has previously resulted in the vacatur of awards. (Doc. No. 36-1 at 11). Despite the CBA's language, Plaintiff argues that the award failed to look within the CBA to determine what operations were covered by the agreement and it clearly and improperly amended the CBA by further forbidding it and Talon from going "forward with any kind of transfer, sale, **lease**, etc" unless it meets certain conditions.[2] (*See* Doc. No. 36-1 at 31-32) (emphasis in original).

The court may not review the merits of an arbitration award. Such an argument tiptoes the line of whether the arbitrator exceeded his authority or whether Plaintiff is asking the court to interpret the contract language. The court will not cross the line and consider a merits argument. However, it is worth noting that although Plaintiff argues that the CBA was improperly amended through the inclusion of the word "lease," it is clear from the Complaint and arbitration award that the argument was about the sale of the land to Talon, not about leasing it.[3] Moreover, the arbitrator found the language clear and unambiguous, and Plaintiff did not offer any authority to suggest that the type of operation factored into the application of the CBA's successorship provision. It is also notable to this court that Plaintiff spends much of its briefing arguing how critical the term "operations" is. Specifically, how the term has special legal meanings, that the industry has an

---

[2] The parties' CBA also states that "[t]he Company agrees that it will not lease, sublease or license out any coal lands, coal producing facilities or coal preparation facilities where the purpose thereof is to avoid the application of this Agreement or any section, paragraph or clause thereof." (Doc. No. 25-8 at 4). Plaintiff's briefing provides that the award ignored the provision applying to leases and without discussion of the provision, the arbitrator prohibited leasing unless the successorship clause is assumed. (Doc. No. 36-1 at 23). The court will not try to read the arbitrator's mind, guess what provisions of the CBA were considered, or interpret the provisions of the CBA for the parties.

[3] The recitation of Plaintiff's position in the arbitrator's award provides, "the option agreement only includes the surface rights and does not include the underlying coal rights or leases; and that the coal rights in the affected area would remain the property of their current owners…." (Doc. No. 25-21 at 14).

established understanding of the successorship language that the arbitrator failed to apply, and has previously been found ingrained in the industry. (Doc. No.36-1 at 12, 15-16). Even so, elsewhere Plaintiff states that the arbitrator failed to interpret or give the term "operations" its plain, simple, and ordinary meaning. (*Id.* at 29-30). Plaintiff's argument that the arbitrator failed to consider the plain and simple meaning of "operations," is incongruous with its argument that the arbitrator failed to consider the terms' special legal meanings and understanding of the term as used in the industry. Both statements cannot be true.

Even if the court did find that the arbitrator failed to address the term "operations," based on the arbitrator's review of the grievance procedures leading up to the award, in denying the grievance, Plaintiff responded that, "no conclusion of sale has occurred to trigger the successorship obligations under the CBA." (Doc. No. 25-21 at 4).[4] It seems even Plaintiff agreed that if the sale occurred, the successorship obligations would be triggered but was content to ignore the clear and unambiguous language of the CBA that specifically directed Plaintiff to first secure the written agreement of the successor to secures its obligations before the operations are sold, conveyed, or otherwise transferred or assigned.

Plaintiff also argues that rather than relying on the plain language of the CBA's successorship provision, Arbitrator Cannavo instead attempted to establish the intent of the

---

[4] Elsewhere in the award the arbitrator addressed the statements of Plaintiff's witness, who stated that "in this case the Talon deal was not a sale and it was a small portion of the mine and that successorship would apply if there was a significant divestment of the mine. The witness said he did not ascertain why successorship obligations were involved. He also said that successorship obligations would apply had this been a sale of all or substantial part of the mine." (Doc. No. 25-21 at 34).

As later recited by the arbitrator, "[t]he witness was referred to the first paragraph [of a letter] noting that it confirmed the intent of the Company to option and sell to Talon real property that is part of the former Beulah Mine operation. He agreed those were his words. The Union then asked if the Company promises that its operations covered by the collective bargaining agreement will not be sold without a written successorship agreement and if the witness agrees this is what the collective bargaining agreement provides; and he answered in the affirmative." (Doc. No. 25-21 at 37).

provision through the parties' bargaining history, which was inappropriate. (Doc. No. 36-1 at 33). The court agrees with Defendant that the arbitrator properly consulted the parties' bargaining history to resolve questions not answered by the plain text, namely the question of whether there would be a separation of operation proposed by Talon and the entire operation as covered by the CBA. (*See* doc. No. 25-21 at 48). Frankly, as pointed out by Defendant, it is confusing how on one hand Plaintiff argues that Arbitrator Cannavo failed to consider industrial common law, but on the other hand argues consideration of the 2014 Memorandum of Understanding is improper parol evidence when industrial common law includes past practices of the industry and shop, as well as negotiating history and other extrinsic evidence of intent. *Bureau of Engraving, Inc. v. Graphic Commc'ns Int'l Union, Loc. 1B*, 164 F.3d 427, 429 (8th Cir. 1999). Arbitrator Cannavo considered the Memorandum but noted it was unexecuted in nature. Even so, it represents the parties' bargaining and negotiating history.

Arbitrators are permitted to look at sources other than the collective bargaining agreement to aid in the interpretation of the contract but cannot amend the contract. *Keebler Co. v. Milk Drivers & Dairy Emps. Union, Loc. No. 471*, 80 F.3d 284, 288 (8th Cir. 1996); *see Iowa Beef Processors, Inc. v. Amalgamated Meat Cutters & Butcher Workmen of N. Am., AFL-CIO*, 627 F.2d 853, 857 (8th Cir. 1980) ("The arbitrator has a right to interpret and apply the contract and in doing so to consider not only the formal agreement but collateral materials as well including past prevailing practices in the company plant.").

As previously discussed, the arbitrator considered the unexecuted Memorandum in response to assertions made by Plaintiff and General Counsel that successorship obligations would not be invoked or applied as the relevant areas were never mined and no coal mining is occurring, would have no effect on reclamation, and the work in question would pertain to a transloading

business with its own job classifications, its own pay rates and job duties. (Doc. No. 25-21 at 47-48). The unexecuted Memorandum represented collective bargaining between the parties to include transloading into the bargaining unit and governed by the CBA. (*Id.* at 48). It included a provision regarding jobs, wherein it stated, "Shop Welders, Mechanics and Electricians will be used/shared in the coal mine or transloading facility as required." (*Id,*). Based on this provision, the arbitrator concluded there would not be a separation of the operation Talon proposed to assume/purchase and the operation as a whole covered by the CBA that would justify not triggering the successorship clause. (*Id.*).

Even if the arbitrator did not consider the unexecuted Memorandum, which he could do as a standard of the parties' past practices and history, the arbitrator also based this finding on the fact Plaintiff informed Defendant that upon consummating of the deal with Talon, assumption of the CBA by Talon would be "triggered," and Plaintiff's acknowledgment that the successorship clause would be triggered upon the sale being final ignored the clear and unambiguous requirement that an agreement by the successor to assume the obligations of the CBA must occur first. (*Id.*).

As to the CBA's plain language, Plaintiff attempts to argue that the arbitrator failed to look within the CBA to determine exactly what operations were covered by the agreement. (Doc. No. 36-1 at 29). Plaintiff specifically takes issue with Arbitrator Cannavo's reference to "Appendix F of the collective bargaining agreement," when Appendix F is merely a portion of the agreement's table of contents that spilled over from a previous page and the successorship clause is in the very first paragraph of the CBA. Plaintiff also points to its appearance again later in the award.

An arbitrator's award will not be set aside in instances where the arbitrator made "serious error" in interpreting the contract. *United Food & Com. Workers Union, Loc. No. 663 v. Seneca Foods Corp.*, No. 25-CV-2891 (KMM/EMB), 2026 WL 995195, at *4 (D. Minn. Apr. 14, 2026);

*see also Sullivan v. Endeavor Air, Inc.*, 856 F.3d 533, 537 (8th Cir. 2017) ("Judicial review of a labor-arbitration decision … is very limited. Courts are not authorized to review the arbitrator's decision on the merits despite allegations that the decision rests on factual errors or misinterprets the parties' agreement.") (quoting *Brotherhood of Maint. of Way Emps. V. Soo Line R.R.*, 266 F.3d 907, 909 (8th Cir. 2001)). This court will not set aside the award based on the arbitrator's misinterpretation in construing the successorship clause to be part of Appendix F or consider Plaintiff's argument that this error meant the arbitrator failed to consider the remainder of the CBA.

The contract language regarding successorship has been adopted from the BCOA Agreement and interpreted by Courts in disputes similar to the instant matter. (Doc. No. 25-21 at 48). "If these interpretations did not accord with the parties' understanding of their contract, they had ample opportunity to make their own understanding explicit. Failure to do so strongly suggests the parties incorporated the courts' interpretation of the agreements." *Carbon Fuel Co. v. United Mine Workers of Am.*, 444 U.S. 212, 222 (1979). Arbitrator Cannavo concurred with the Courts' findings, noting that if operations or a transfer of operations is a successorship issue, parties to a CBA have the opportunity to negotiate through arbitration.

Plaintiff also points to the award's use of the term "good faith" as an example of "industrial justice" and because the arbitrator inserted his own standard into the CBA, the award should be vacated. (Doc. No. 36-1 at 24). "The Award's insistence on analyzing whether Westmoreland operated in good faith is improper." (*Id.*).

Plaintiff fails to note that it first mentioned good faith in its Step 3 written response to the grievance, and continuously reiterated that it acted in good faith, both in the closing brief to the arbitrator and as noted throughout the award. As opined in the Step 3 written response:

The Company has acted in good faith throughout this process by:

- Communicating its intent to share a redacted version of the agreement post-closing,
- Providing the Union's legal counsel with a NDA for signature to facilitate the secure sharing of information, and
- Remaining open and willing to engage in discussions with the Union.

(Doc. No. 25-10 at 1). Arbitrator Cannavo reiterated as much in the award. (Doc. No. 25-21 at 4).

In the discussion and opinion section of the award, Arbitrator Cannavo determined that much of the arbitral and judicial authority located in his research of successorship in coal and other industries revolves around the question of "good faith." (*Id.* at 40). The arbitrator did not address the issue of good faith without reason, rather he encountered the authority through party submissions and his own research.

In contending the arbitrator's award did not draw its essence from the CBA, Plaintiff pointed to the fact that the CBA contains no references to good or bad faith, and the NLRB has exclusive jurisdiction over claims that may constitute unfair labor practices. (Doc. No. 36-1 at 28). However, Arbitrator Cannavo clearly stated in the award, "that he is not ruling on the unfair labor practice charge; nor is he substituting his judgment for that of NLRB." (Doc. No. 25-21 at 40). Elsewhere in the award he repeated this point.

> [t]he Arbitrator understands that he is not being asked to determine whether or not the Company violated the National Labor Relations Act. And any discussion, herein regarding the NLRB, is merely a device to determine what, if any, information the Company is required to provide the Union as a result of this grievance and arbitration.

(*Id.* at 45). It is also notable that the arbitrator did not speak in absolutes. "It is possible, as perhaps in this case, for an employer to have a good faith belief that it is acting in good faith. However, that does not necessarily translate into 'good faith' conduct." (*Id.*at 40) (emphasis added).

Defendant points out that one exhibit it introduced was the *Seneca Coal Company* arbitration award (*see* Doc. No. 25-4), which discussed a successorship clause and the use of good

faith. (Doc. No. 38 at 24). Both parties were aware of the submission of this exhibit, with Plaintiff arguing that Defendant's reliance on it was "substantially misplaced." (*See* Doc. No. 25-20 at 5). Based on Defendant's submission of the authority and the parties' discussion of it, the court agrees with Defendant that "[a]n arbitrator who takes up a concept supplied by the authority the parties themselves submitted and discussed is resolving their dispute, not inventing a standard." (Doc. No. 38 at 24).

Lastly, Plaintiff argues that the issue before the arbitrator was a simple one – "was the nickel processing facility a mining operation as contemplated by the parties in their successorship provision or not." (Doc. No. 36-1 at 34). This is not the argument the arbitrator considered. Rather, the arbitrator focused on whether Plaintiff violated the successorship clause of the CBA by not securing a promise from the potential buyer to assume its obligations pursuant to the CBA, and whether Plaintiff failed to act in good faith in response to Defendant's information request regarding the potential sale and successorship. (*See* Doc. No. 25-21 at 42).

## IV. CONCLUSION

For the reasons articulated above, the court **GRANTS** Defendant's *Motion for Summary Judgment* (Doc. No. 35), **DENIES** Plaintiff's *Motion for Summary Judgment* (Doc. No. 36), and deems **MOOT** Defendant's *Motion for Preliminary Injunction* (Doc. No. 21). The January 24, 2026, arbitration award is confirmed and enforced. Plaintiff shall comply with the award as prescribed by the arbitrator.

**IT IS SO ORDERED.**

Dated this 28th day of October, 2026.

*/s/ Clare R. Hochhalter*
Clare R. Hochhalter, Magistrate Judge
United States District Court